UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

| | | |
|---|---|---|
| **VICTOR ZAMUDIO SANCHEZ,** | § | |
| | § | |
| *Petitioner*, | § | |
| | § | |
| **v.** | § | |
| | § | |
| **KRISTI NOEM,** Secretary of Homeland | § | **EP-25-CV-00403-DCG** |
| Security; and **MARY DE ANDA-** | § | |
| **YBARRA**, Field Office Director of ICE in | § | |
| El Paso, | § | |
| | § | |
| *Respondents*. | § | |

<u>**ORDER GRANTING PETITION FOR WRIT OF HABEAS CORPUS**</u>

Petitioner Victor Zamudio Sanchez ("Petitioner") seeks a writ of habeas corpus pursuant

to 28 U.S.C. § 2241.[1] Petitioner argues that his ongoing detention by United States Immigration

and Customs Enforcement ("ICE") violates the Due Process Clause of the Fifth Amendment.[2]

Respondents Kristi Noem and Mary De Anda-Ybarra ("Respondents") oppose the Petition.[3]

---

[1] Pet., ECF No. 1.

[2] *Id.* at 13.

Petitioner also challenges his ongoing detention under the Fourth Amendment. *See id.* Respondents maintain that Petitioner's Fourth Amendment claim is a non-habeas claim that the Court may not resolve in these proceedings. *See* Resp., ECF No. 7, at 3 n.5. Because the Court concludes below that Petitioner is entitled to habeas relief under the Fifth Amendment, the Court need not resolve this issue or discuss it further. *See, e.g., Fleming v. Collins*, 917 F.2d 850, 852 (5th Cir. 1990) ("Because we grant habeas corpus [relief] . . . on the first ground, we need not reach the other claims [petitioner] raises."); *Trotter v. Warden La. State Penitentiary*, 718 F. Supp. 2d 746, 756 (W.D. La. 2010) ("Petitioner is entitled to habeas relief on the claim. The court need not reach the other claims raised by Petitioner." (citation modified)).

All page citations in this Order refer to the page numbers assigned by the Court's CM/ECF system, rather than the internal pagination of the cited document.

[3] *See generally* Resp.

For the following reasons, the Court **GRANTS** the "Petition for Writ of Habeas Corpus" (ECF No. 1) **IN PART** and **ORDERS** Respondents to either give Petitioner a bond hearing or release Petitioner from custody.

I.    Background

    A.    **Factual History**

The following facts are undisputed unless otherwise noted. Petitioner is a Mexican citizen who entered the United States without inspection in 1996.[4] Petitioner concedes that he qualifies as an "alien" under U.S. immigration law.[5]

On June 16, 2025, the Florida Highway Patrol arrested Petitioner in Orange County, Florida, for allegedly driving without a valid license.[6] ICE then served the Orange County Jail ("OCJ") with an immigration detainer, which informed OCJ personnel that ICE intended to assume custody of Petitioner to effectuate his removal from the country once OCJ ultimately released Petitioner.[7]

---

[4] Pet. at 3.

*See also id.* at 12 (stating that Petitioner has four U.S. citizen children).

[5] *Id*. at 3.

[6] *Id*.

[7] *Id*. at 4.

*See also* 8 C.F.R. § 287.7(a) ("Any authorized immigration officer may at any time issue a Form I–247, Immigration Detainer–Notice of Action, to any other Federal, State, or local law enforcement agency. A detainer serves to advise another law enforcement agency that the Department seeks custody of an alien presently in the custody of that agency, for the purpose of arresting and removing the alien. The detainer is a request that such agency advise the Department, prior to release of the alien, in order for the Department to arrange to assume custody, in situations when gaining immediate physical custody is either impracticable or impossible.").

Respondents claim that ICE issued a Notice to Appear ("NTA") for Petitioner on June 18, 2025 (the "Initial NTA").[8] However, Respondents did not attach a copy of the Initial NTA to their briefing in this case,[9] and the record contains no indication that ICE ever served the Initial NTA on Petitioner.[10] Moreover, as the Court will explain below, the Immigration Judge ("IJ") presiding over Petitioner's case stated at an August 2025 hearing that the agency had not issued an NTA or other charging document against Petitioner before the hearing date.[11] The Court therefore has no basis to conclude that the Government issued the Initial NTA or otherwise initiated removal proceedings against Petitioner before he filed this case.[12]

---

[8] Resp. at 3 n.1; *see also* Superseding NTA, ECF No. 7-1, at 1 (referencing an NTA that was "issued on June 18, 2025" and subsequently superseded on September 27, 2025).

An NTA is a charging document that "initiates a proceeding before an Immigration Judge." *See* 8 U.S.C. § 1003.13; *see also id.* § 1003.14(a) ("Jurisdiction vests, and proceedings before an Immigration Judge commence, when a charging document is filed with the Immigration Court . . . .").

[9] *See* Superseding NTA at 1–3 (attaching a later NTA dated September 27, 2025 as the only exhibit to Respondents' Response).

[10] *See* Pet. at 11 (alleging that, as of September 22, 2025, "ICE ha[d] made no effort to initiate removal proceedings against [Petitioner] by issuing [an NTA]").

[11] *See id.* at 10 (alleging that, at Petitioner's custody redetermination hearing on August 22, 2025, the Immigration Judge concluded that "Petitioner was not eligible for a custody redetermination hearing because a charging document [*i.e.*, an NTA] had not yet been issued against Petitioner"); *see also infra* notes 18–19 and accompanying text.

[12] *See* Pet. at 15 (filed September 17, 2025).

On or about July 2, 2025, OCJ turned Petitioner over to ICE, which transported Petitioner to an immigration detention facility.[13] Upon taking custody of Petitioner, the Government made an initial custody determination that Petitioner was not entitled to release on bond.[14]

Petitioner made three unsuccessful attempts to induce an IJ to review the Government's determination of his custody status and bond eligibility.[15] The attempt in July failed because an IJ concluded that Petitioner was still in state custody, even though the federal government had taken physical possession of Petitioner upon his release from OCJ.[16] The attempt in early August failed because the Government relocated Petitioner to another facility before his scheduled hearing could take place.[17] And the attempt in late August failed because—notwithstanding Respondents' claim that the agency had issued an NTA against Petitioner on June 18, 2025[18]— the IJ determined that "a charging document had not yet been issued against Petitioner" as of August 22, 2025, and that Petitioner was consequently "not eligible for a custody redetermination hearing."[19]

---

[13] Pet. at 4.

[14] *Id.* at 5.

*See also Buenrostro-Mendez v. Bondi*, 166 F.4th 494, 500 (5th Cir. 2026) (recounting how "in July 2025, the Board of Immigration Appeals (BIA) . . . concluded that aliens who enter the United States without inspection and admission" (like Petitioner here) "are subject to mandatory detention").

[15] *See* Pet. at 5–10.

[16] *See id.* at 5–8.

[17] *See id.* at 8–9.

[18] *See supra* notes 8–12 and accompanying text.

[19] *See* Pet. at 10.

Thus, as far as the current record reveals, the Government has neither: (1) given Petitioner a meaningful opportunity to challenge its initial decision to detain him without bond;[20] nor (2) issued a final administrative order of deportation against Petitioner.[21] The Court proceeds under the assumption that no final order of removal exists.[22]

Petitioner is currently detained at Camp East Montana in El Paso.[23] He has been in ICE custody for more than eight months.[24]

### B.    Procedural History

On September 22, 2025, Petitioner filed a Petition for Writ of Habeas Corpus challenging the legality of his detention pursuant to 28 U.S.C. § 2241.[25] Petitioner asks the Court to: (1) assume jurisdiction; (2) find that ICE is indefinitely and unlawfully detaining Petitioner; (3) grant temporary and permanent injunctive relief requiring ICE to release Petitioner from custody; and (4) award Petitioner costs and reasonable attorney's fees.[26]

---

[20] *Id.* at 11.

[21] *See id.* at 8 ("Petitioner has NEVER been the subject of a final administrative order of deportation."); *see also* 8 C.F.R. § 1241.1 (explaining how "[a]n order of removal made by the immigration judge at the conclusion of proceedings under section 240 of the Act shall become final").

[22] While it is possible that the Government issued a final order of removal after briefing on the Petition closed on October 24, 2025, neither Petitioner nor Respondents have informed the Court that the Government has done so.

[23] *See* Detainee Rec., ECF No. 1-1, at 1; *see also* Pet. at 2 ("[Petitioner] is currently detained in the custody of ICE at its ERO El Paso Camp East Montana Facility ('ERO El Paso') located in El Paso, Texas.").

[24] *See* Pet. at 4, 11.

[25] *Id.* at 1.

[26] *Id.* at 15.

The legal claims in the Petition rest on the factual premise that the Government has not yet initiated administrative removal proceedings by issuing an NTA.[27] According to Petitioner, he cannot pursue certain administrative avenues for relief from removal—and, by extension, for relief from his ongoing detention—because ICE did not promptly initiate removal proceedings against him.[28] Additionally, as noted above, an IJ cited the agency's nonissuance of an NTA as grounds for denying Petitioner a bond hearing.[29] Petitioner thus claims that the Government is unconstitutionally holding him in a procedural twilight zone: a state of indefinite detention in which the Government refuses to take the initial administrative step that would give Petitioner procedural mechanisms to challenge that detention.[30] Petitioner demands his immediate release from ICE custody.[31]

---

[27] *See, e.g., id.* at 11 ("ICE has made no effort to initiate removal proceedings against him by issuing a Form I-862, Notice to Appear ('NTA')."); *see also id.* ("[A]s no charging document has been issued by ICE, no [Immigration Judge] may consider Petitioner's case in removal proceedings."); *see also id.* at 12 ("ICE has thus far exhibited no intention on issuing a charging document and placing Petitioner in removal proceedings where he can make application for any form of relief from removal for which he may be eligible to pursue.").

[28] *See id.* at 11–12 ("Petitioner submits that he is eligible to pursue certain forms of relief from removal were he to be placed in removal proceedings as discussed herein. More specifically, Petitioner submits that he is eligible for consideration of a Form EOIR-42B, Application for Cancellation of Removal and Adjustment of Status for Certain Nonpermanent Residents . . . .").

[29] *See id.* at 10 (stating that the IJ determined that "Petitioner was not eligible for a custody redetermination hearing because a charging document had not yet been issued against Petitioner").

[30] *See id.* at 14 ("Petitioner submits that his continued detention without any possibility of release while ICE refuses to initiate removal proceedings against him violates his Constitutional rights . . . ."); *id.* at 15 ("Petitioner is being detained indefinitely without any means of recourse before any administrative agency . . . .").

[31] *Id.* at 15.

On October 16, 2025, the Court preliminarily reviewed the Petition and ordered Respondents to show cause why the Court should not grant the writ.[32] Respondents timely filed their Response on October 24, 2025.[33]

In their Response, Respondents informed the Court of a development that undercut the factual premise underlying Petitioner's claims. On September 27, 2025, after Petitioner filed his Petition, the Government issued a new NTA against Petitioner (the "Superseding NTA").[34] Setting aside the question of whether the Government validly initiated removal proceedings against Petitioner when it supposedly issued the Initial NTA on June 18, 2025,[35] Petitioner now appears to be in formal removal proceedings.[36] The Response does not, however, indicate that the Government has entered a final order of removal against Petitioner.[37]

Respondents argue that 8 U.S.C. § 1225(b)(2) (known as the "catchall" provision) authorizes and requires ICE to detain Petitioner without a bond hearing while his removal

---

[32] *See generally* Order Show Cause, ECF No. 6.

[33] *See generally* Resp.

[34] *See id.* at 3; *see also* Superseding NTA at 1.

[35] *See supra* notes 8–12 and accompanying text.

[36] *See* Resp. at 3 ("ICE filed the [Superseding] NTA with the immigration court on October 7, 2025, which commenced removal proceedings against [Petitioner].").

[37] *See id.* at 14 (arguing that Petitioner's "detention is not indefinite[] because removal proceedings will end[] either with a grant of relief *or with an order of removal*"—thereby implying that the Government has not yet issued a removal order (emphasis added)).

proceedings are pending.[38] Because (according to Respondents) that statute affords detainees all the procedural protections that the Due Process Clause requires, Respondents argue that Petitioner has no valid basis to challenge his ongoing detention under the Fifth Amendment.[39]

## II.    **Legal Standard**

The United States Constitution guarantees that, "absent suspension, the writ of habeas corpus remains available to every individual detained within the United States."[40] This promise extends to individuals in immigration detention, who can challenge their confinement by filing a habeas corpus petition under 28 U.S.C. § 2241.[41] The petitioner bears the burden of showing that he is "in custody in violation of the Constitution or laws or treaties of the United States."[42] Because habeas proceedings are civil in nature, the petitioner "must satisfy his burden of proof by a preponderance of the evidence."[43]

---

[38] *See id.* at 1 ("Petitioner is lawfully detained on a mandatory basis as an applicant for admission pending removal proceedings before an [IJ]."); *see also id.* at 4–8 (Respondents' legal argument that Petitioner is subject to mandatory detention under the catchall provision); *see also Jennings v. Rodriguez*, 583 U.S. 281, 281 (2018) ("Section 1225(b)(2) is a catchall provision that applies to most other applicants for admission not covered by § 1225(b)(1)."); *see also infra* Section III.B (discussing 8 U.S.C. § 1225(b)(2)).

[39] *See* Resp. at 9–11.

[40] *See Hamdi v. Rumsfeld*, 542 U.S. 507, 525 (2004) (citing U.S. CONST. art. I, § 9, cl. 2).

[41] 28 U.S.C. § 2241(c).

*See also Zadvydas v. Davis*, 533 U.S. 678, 687 (2001) ("We conclude that § 2241 habeas corpus proceedings remain available as a forum for statutory and constitutional challenges to post-removal-period detention."). With certain exceptions, this principle applies absent a final order of removal. *See infra* note 56 (discussing provisions that pose "potential obstacles" to courts' jurisdiction in such cases).

[42] *See* 28 U.S.C. § 2241(c)(3) ("The writ of habeas corpus shall not extend to a prisoner unless," with exceptions not relevant here, "he is in custody in violation of the Constitution or laws or treaties of the United States." (citation modified)).

[43] *See, e.g.*, *Villanueva v. Tate*, 801 F. Supp. 3d 689, 696–97 (S.D. Tex. Sept. 26, 2025) (first quoting *Skaftouros v. United States*, 667 F.3d 144, 158 (2d Cir. 2011); then citing *Bruce v. Estelle*, 536 F.2d 1051, 1058 (5th Cir. 1976)).

Under 28 U.S.C. § 2243, the Court must "summarily hear and determine the facts, and dispose of the matter as law and justice require."[44] Because "the facts essential to consideration of the constitutional issue are already before the court," it is unnecessary to hold an evidentiary hearing to decide the Petition; the Court may instead decide the Petition on the papers.[45]

## III.   Discussion

### A.    Jurisdiction

Before addressing the merits of the Petition, the Court must determine whether it has subject matter jurisdiction.[46]

#### 1.    Mootness

As noted, Petitioner framed his Petition largely as a challenge to the Government's refusal to initiate removal proceedings against him by issuing an NTA.[47] The Government has now initiated removal proceedings against Petitioner by issuing the Superseding NTA after

---

[44] *See* 28 U.S.C. § 2243.

[45] *See Tijerina v. Thornburgh*, 884 F.2d 861, 866 (5th Cir. 1989); *see also id.* ("However, the district court need not hold an evidentiary hearing for each habeas petitioner." (citation modified)).

Here, the relevant constitutional issue is whether Petitioner is being unconstitutionally detained prior to the issuance of a final removal order. The Court addresses the issue as it has been presented. If the underlying facts have changed, the parties may alert the Court. *See infra* note 166 and accompanying text.

[46] *See Louisiana v. U.S. Dep't of Energy*, 90 F.4th 461, 466 (5th Cir. 2024) ("Jurisdiction is always first.").

[47] *See supra* notes 27–30 and accompanying text.

Petitioner filed his Petition.[48] The Court must therefore consider *sua sponte* whether that post-filing factual development renders the Petition moot.[49]

It does not. "[A] case becomes moot only when it is impossible for a court to grant any effectual relief whatever to the prevailing party."[50] Although Petitioner can no longer argue that the Government has denied him procedural avenues for relief by failing to formally initiate administrative proceedings,[51] he (as far as the record reveals) has remained in ICE custody for eight months without a final order of removal.[52] It is still possible to grant Petitioner effectual relief.[53] Accordingly, the Petition is not moot.

### 2.    Statutory Jurisdiction

Having assured itself that it has constitutional jurisdiction to hear the Petition, the Court next considers whether it has statutory jurisdiction over Petitioner's claims.[54] Under 28 U.S.C. § 2241, district courts may grant writs of habeas corpus to those "in custody in violation of the Constitution or laws or treaties of the United States."[55]

---

[48] *See supra* notes 34–36 and accompanying text.

[49] *See, e.g.*, *La. Env't Action Network v. EPA*, 382 F.3d 575, 581 (5th Cir. 2004) ("If a dispute has been resolved, or if it has evanesced because of changed circumstances, it is considered moot."); *Springer v. U.S. Marshal*, 137 F. App'x 657, 658 (5th Cir. 2005) ("The mootness of a controversy is a jurisdictional issue that [courts] must raise sua sponte.").

[50] *See, e.g.*, *United States v. Sosebee*, 59 F.4th 151, 154 (5th Cir. 2023) (citation modified).

[51] *See supra* notes 28–30 and accompanying text.

[52] *See supra* notes 22–24 and accompanying text.

[53] *See infra* notes 156–162 and accompanying text.

[54] *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994) ("Federal courts are courts of limited jurisdiction. They possess only that power authorized by Constitution and statute.").

[55] *Zadvydas*, 533 U.S. at 699 (quoting 28 U.S.C. § 2241(c)(3) (citation modified)).

Congress has divested district courts of jurisdiction to adjudicate certain immigration-related claims that might otherwise be cognizable under § 2241.[56] To that end, Respondents argue that two provisions of the INA strip the Court of jurisdiction over the instant Petition. For the following reasons, those provisions do not apply to this case.

### a.     8 U.S.C. § 1252(g)

Respondents first argue that 8 U.S.C. § 1252(g) divests the Court of jurisdiction over the Petition.[57] This provision prevents federal district courts from considering "any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under [the INA]."[58] However, Petitioner exclusively challenges his *detention* as unlawful.[59] He explicitly disclaims any intention to "challenge the Department of Homeland Security's authority to conduct removal proceedings against him or any other action taken by the federal government."[60]

---

[56] The INA contains provisions that limit federal district courts' jurisdiction in immigration cases. *See Jennings*, 583 U.S. at 292–96 (discussing provisions that pose "potential obstacles" to courts' jurisdiction in such cases); *see also Bouarfa v. Mayorkas*, 604 U.S. 6, 18 (2024) (discussing "jurisdiction-stripping provision[s]" in the INA).

[57] Resp. at 8.

*See also* 8 U.S.C. § 1252(g) ("Except as provided in this section and notwithstanding any other provision of law (statutory or nonstatutory), including section 2241 of Title 28, or any other habeas corpus provision, and sections 1361 and 1651 of such title, no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter.").

[58] 8 U.S.C. § 1252(g).

[59] *See* Pet. at 13 ("Petitioner challenges the constitutionality of his ongoing, indefinite and unlawful detention.").

[60] *Id.* (citation modified).

Respondents contend that Petitioner nonetheless improperly challenges "the *decision* to detain him in the first place,"[61] which "arises directly from the decision to commence and/or adjudicate removal proceedings"[62] and thus precludes judicial review. The Supreme Court foreclosed this argument when it declined to interpret § 1252(g) "to sweep in any claim that can technically be said to 'arise from' the three listed actions of the Attorney General" (*i.e.*, "to commence proceedings, adjudicate cases, or execute removal orders").[63] Instead, the Court "read the language to refer to *just those three specific actions* themselves."[64] The Fifth Circuit has explained that although a detention order is "intimately related to efforts to deport," it cannot be said to "arise from" the decision to either commence proceedings, adjudicate cases, or execute removal orders.[65] Because § 1252(g) does not "sweep in" challenges to detention, it does not deprive the Court of jurisdiction in this case.[66]

---

[61] Resp. at 8 (emphasis added).

[62] *Id.*

[63] *Jennings*, 583 U.S. at 294 (citing *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 482–83 (1999)).

[64] *Id.* (emphasis added).

[65] *See Cardoso v. Reno*, 216 F.3d 512, 516–17 (5th Cir. 2000) ("[S]ection 1252(g) does not bar courts from reviewing an alien detention order, because such an order, 'while intimately related to efforts to deport, is not itself a decision to "execute removal orders" and thus does not implicate section 1252(g).'").

[66] *See, e.g.*, *Hernandez Santos v. Merrick*, No. 5:25-CV-01765, 2026 WL 300786, at *3 (W.D. Tex. Jan. 30, 2026) ("8 U.S.C. [§] 1252(g) . . . deprive[s] the Court of jurisdiction to consider challenges to *removal proceedings*, not challenges to *detention*."); *see also, e.g.*, *Mendoza-Menjivar v. Bondi*, No. 1:25-CV-02060, 2026 WL 89964, at *2 (W.D. Tex. Jan. 12, 2026) ("[B]ecause Petitioner challenges the lawfulness of his continued detention during the pendency of his removal proceedings, § 1252(g) does not apply.").

### b.    8 U.S.C. § 1225(b)(4)

Respondents argue next that 8 U.S.C. § 1225(b)(4) curtails the Court's jurisdiction over the Petition.[67] This provision states that "[t]he decision of the examining immigration officer, if favorable to the admission of any alien, shall be subject to challenge by any other immigration officer and such challenge shall operate to take the alien whose privilege to be admitted is so challenged, before an immigration judge for a proceeding under section 1229a of this title."[68]

As this Court has previously explained, § 1225(b)(4) only applies when there has been a "decision . . . *favorable* to the admission of [an] alien."[69] No such decision was issued as to Petitioner, as Petitioner entered the United States without inspection (that is, without any decision to admit him into the country).[70] Respondents' argument is therefore inapposite.[71]

---

[67] Resp. at 9.

[68] 8 U.S.C. § 1225(b)(4).

[69] *See id.* (emphasis added).

*See also, e.g.*, *Alvarado Luna v. Warden*, No. 3:25-CV-00565-DCG, 2025 WL 3787494, at *4–5 (W.D. Tex. Dec. 29, 2025) (observing that although 8 U.S.C. § 1225(b)(4) "allows *immigration officers* to initiate IJ review of a decision 'favorable to the admission' of Petitioner," it does not "prevent *Petitioner* from challenging the lawfulness of his detention"), *overruled in part by*, *Buenrostro-Mendez*, 166 F.4th at 498–508.

*See also id.* at *5 ("Not only are these distinct concepts, but Respondents themselves argue that they never admitted Petitioner into the country. Thus, there is no decision 'favorable to the admission of' Petitioner to review.").

[70] *See* Resp. at 2, 7.

[71] *See, e.g.*, *Aldana Perez v. Noem*, No. 5:25-CV-01534, 2025 WL 3654262, at *3 (W.D. Tex. Dec. 5, 2025) ("Section 1225(b)(4) is plainly inapplicable to Petitioner, who has not received any favorable determination of her admissibility. Moreover, Section 1225(b)(4) applies to challenges to favorable admissions decisions brought by *other immigration officers*. It has nothing to do with the scope of DHS's detention authority or the federal courts' jurisdiction over challenges to detention. . . . Accordingly, Respondents' reference to 8 U.S.C. § 1225(b)(4) is simply misplaced.").

The challenges raised in this Petition fall squarely within the scope of § 2241, and neither of Respondents' proffered provisions apply here, so the Court retains jurisdiction over the Petition.

### B.    Immigration and Nationality Act

Respondents assert that Petitioner is properly detained under the Immigration and Nationality Act ("INA") at 8 U.S.C. § 1225(b)(2).[72] The provision states that if "an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a proceeding"[73] to determine "inadmissibility or deportability."[74] For decades, the Government interpreted § 1225(b)(2) as only applying to noncitizens who arrive at the border or a port of entry.[75] However, the Fifth Circuit recently held in *Buenrostro-Mendez* that "aliens who enter the United States without inspection and admission are subject to mandatory detention under § 1225(b)(2)," even if they "were apprehended months or years" after their initial entry.[76]

Petitioner does not contest the statutory basis for his detention.[77] The *Buenrostro-Mendez* court confined its decision to statutory interpretation and did not reach the constitutional issues

---

[72] Resp. at 4 ("Petitioner here is detained under the catchall provision" (citing 8 U.S.C. § 1225(b)(2)).

[73] 8 U.S.C. § 1225(b)(2)(A) (requiring that the proceeding is held "under section 1229a of this title").

[74] *Id.* § 1229a(a)(1).

[75] *See Alvarado Luna*, 2025 WL 3787494, at *2 (collecting cases).

[76] *Buenrostro-Mendez*, 166 F.4th at 500, 498.

[77] *See generally* Pet.

that Petitioner raises.[78] Thus, *Buenrostro-Mendez* does not control whether Respondents are detaining Petitioner in violation of the Constitution.[79]

### C.     Due Process Clause of the Fifth Amendment

The Due Process Clause of the Fifth Amendment "forbids the Government to deprive any person of liberty without due process of law."[80] Because "Due Process is flexible" and "calls for such procedural protections as the particular situation demands,"[81] its "meaning can be as opaque as its importance is lofty."[82] To lend clarity to an otherwise "uncertain enterprise,"[83] the Court briefly unpacks portions of the Due Process Clause before turning to the merits of the Petition.

As to "*liberty*," freedom from physical detention is "the most elemental of liberty interests."[84] "Liberty is the norm, and detention prior to trial or without trial is the carefully limited exception."[85] This norm is woven throughout Fifth Amendment jurisprudence, which

---

[78] *See Buenrostro-Mendez*, 166 F.4th at 498.

[79] *See* Order, *Tellez-Aguilar v. De Anda-Ybarra*, No. 3:26-CV-238-KC (W.D. Tex. Feb. 9, 2026), ECF No. 4.

[80] *See Zadvydas*, 533 U.S. at 690 (citation modified); *see also Douglass v. Nippon Yusen Kabushiki Kaisha*, 46 F.4th 226, 236 (5th Cir. 2022) ("[T]he Fifth Amendment Due Process Clause limits the federal government, while the Fourteenth Amendment Due Process Clause limits the states.").

[81] *Jennings*, 583 U.S. at 314 (citation modified).

[82] *Lassiter v. Dep't Soc. Servs. of Durham County, N.C.*, 452 U.S. 18, 25 (1981).

[83] *Id.*

[84] *Hamdi*, 542 U.S. at 529; *see also Jones v. United States*, 463 U.S. 354, 361 (1983) ("It is clear that commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection." (quoting *Addington v. Texas*, 441 U.S. 418, 425 (1979) (citation modified))).

[85] *United States v. Salerno*, 481 U.S. 739, 755 (1987) (citation modified).

reiterates that "freedom from bodily restraint has always been at the core of the liberty protected by the Due Process Clause from arbitrary governmental action."[86]

As to "*any person*," citizens and noncitizens alike are entitled to the protections guaranteed by the Due Process Clause.[87] These protections are triggered by a person's entry into the "territorial boundaries" of the United States.[88] And "once an alien enters the country, the legal circumstance changes, for the Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent."[89] However, the Due Process Clause does not apply with *equal force* to citizens and

---

[86] *Foucha v. Louisiana*, 504 U.S. 71, 80 (1992) (citation modified); *see also Mathews v. Eldridge*, 424 U.S. 319, 333 (1979) ("The 'right to be heard before being condemned to suffer grievous loss of any kind, even though it may not involve the stigma and hardships of a criminal conviction, is a principle basic to our society.'" (quoting *Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 168 (1951) (Frankfurter, J., concurring))).

[87] *Trump v. J. G. G.*, 604 U.S. 670, 673 (2025) ("'It is well established that the Fifth Amendment entitles aliens to due process of law' in the context of removal proceedings." (quoting *Reno v. Flores*, 507 U.S. 292, 306 (1993))).

*See also, e.g.*, *Garcia v. Noem*, No. 3:25-CV-00624-DB, 2025 WL 3645179, at *3 (W.D. Tex. Dec. 16, 2025) (holding that the Fifth Amendment Due Process Clause applied to petitioner who entered United States without detection and lived in the country since 2006).

[88] *See Zadvydas*, 533 U.S. at 693 (citing *United States v. Verdugo-Urquidez*, 494 U.S. 259, 269 (1990)); *see also id.* ("The distinction between an alien who has effected an entry into the United States and one who has never entered runs throughout immigration law.").

[89] *Id.* (first citing *Plyler v. Doe*, 457 U.S. 202, 210 (1982); then citing *Mathews v. Diaz*, 426 U.S. 67, 77 (1976); then citing *Kwong Hai Chew v. Colding*, 344 U.S. 590, 596–98 & n. 5 (1953); and then citing *Yick Wo v. Hopkins*, 118 U.S. 356, 369 (1886)).

*But see DHS v. Thuraissigiam*, 591 U.S. 103, 107 (2020) (making exception for "an alien at the *threshold* of initial entry," who "was apprehended just 25 yards from the border" and "therefore ha[d] no entitlement to procedural rights other than those afforded by statute").

noncitizens.[90] Noncitizens' liberty interests "are subject to limitations and conditions not applicable to citizens."[91]

As to "*due process of law*," the Constitution "requires that the nature and duration of commitment bear some reasonable relation to the purpose for which the individual is committed."[92] Civil detention will *only* comport with due process "in certain special and narrow nonpunitive circumstances, where a special justification . . . outweighs the individual's constitutionally protected interest in avoiding physical restraint."[93]

To determine whether a "special justification" outweighs an individual's liberty interest, the Supreme Court tends to consider whether detention will either (1) mitigate danger to the community;[94] or (2) prevent the detainee from fleeing before the case is resolved.[95] The Supreme

---

[90] *See Demore v. Kim*, 538 U.S. 510, 522 (2003) ("Congress may make rules as to aliens that would be unacceptable if applied to citizens.").

[91] *See id.* (quoting *Zadvydas*, 533 U.S. at 718 (Kennedy, J., dissenting)).

[92] *Jackson v. Indiana*, 406 U.S. 715, 738 (1972).

[93] *Zadvydas*, 533 U.S. at 690 (paraphrasing *Foucha*, 504 U.S. at 80); *see also Addington*, 441 U.S. at 425 ("This Court repeatedly has recognized that civil commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection.").

[94] *See, e.g.*, *Salerno*, 481 U.S. at 739 ("Preventing danger to the community is a legitimate regulatory goal."); *Flores*, 507 U.S. at 316 (O'Connor, J., concurring) ("There must be a 'sufficiently compelling' governmental interest to justify [institutionalization], usually a punitive interest in imprisoning the convicted criminal or a regulatory interest in forestalling danger to the community."); *Hilton v. Braunskill*, 481 U.S. 770, 779 (1987) ("We do not agree that the Due Process Clause prohibits a court from considering . . . the dangerousness of a habeas petitioner as part of its decision whether to release the petitioner pending appeal." (citation modified)).

[95] *See, e.g.*, *Zadvydas*, 533 U.S. at 691–92 ("[O]nce the flight risk justification evaporates, the only special circumstance present is the alien's removable status itself, which bears no relation to a detainee's dangerousness."); *Demore*, 538 U.S. at 520 (noting concern about rate of "criminal aliens released on bond [who] absconded prior to the completion of [their] removal proceedings").

Court has relied on these factors in cases involving varied forms of civil confinement,[96] such as criminal pretrial detention,[97] involuntary commitment to mental health facilities,[98] and mandatory immigration detention.[99] Individualized custody determinations cohere with the general principle that "due process is flexible and calls for such procedural protections as the particular situation demands."[100]

In certain cases, the Supreme Court has nonetheless held that the Government may detain noncitizens pending removal proceedings *without* conducting individualized bond hearings. For

---

[96] *See, e.g.*, *Zadvydas*, 533 U.S. at 690–91 (comparing immigration detention to involuntary civil commitment and pretrial detention (first citing *Kansas v. Hendricks*, 521 U.S. 346, 368 (1997); then citing *Salerno*, 481 U.S. at 747, 750–52)); *see also Demore*, 538 U.S. at 553 (Souter, J., concurring in part and dissenting in part) ("Nowhere [in *Zadvydas*] did we suggest that the 'constitutionally protected liberty interest' in avoiding physical confinement, even for aliens already ordered removed, was conceptually different from the liberty interest of citizens considered in [civil confinement law cases]. On the contrary, we cited those cases and expressly adopted their reasoning, even as applied to aliens whose right to remain in the United States had already been declared forfeited.").

[97] *See, e.g.*, *Salerno*, 481 U.S. at 749 ("If the police suspect an individual of a crime, they may arrest and hold him until a neutral magistrate determines whether probable cause exists." (citing *Gerstein v. Pugh*, 420 U.S. 103 (1975)); *see also id.* ("An arrestee may be incarcerated until trial if he presents a risk of flight or a danger to witnesses." (citing *Bell v. Wolfish*, 441 U.S. 520, 534 (1979) (citation modified))).

[98] *See, e.g.*, *Jones*, 463 U.S. at 370 ("We hold that when a criminal defendant establishes by a preponderance of the evidence that he is not guilty of a crime by reason of insanity, the Constitution permits the Government, on the basis of the insanity judgment, to confine him to a mental institution until such time as he has regained his sanity or is no longer a danger to himself or society."); *see also Hendricks*, 521 U.S. at 357 ("We have consistently upheld such involuntary commitment statutes provided the confinement takes place pursuant to proper procedures and evidentiary standards.").

[99] *See, e.g.*, *Zadvydas*, 533 U.S. at 690 ("[T]he first justification—preventing flight—is weak or nonexistent where removal seems a remote possibility at best."); *id.* at 690–91 ("The second justification—protecting the community—does not necessarily diminish in force over time. But we have upheld preventive detention based on dangerousness only when limited to specially dangerous individuals and subject to strong procedural protections.").

[100] *See Morrissey v. Brewer*, 408 U.S. 471, 481 (1972) (citation modified).

example, the Supreme Court upheld the mandatory detention of "deportable criminal aliens,"[101]

certain "alien juveniles,"[102] and "Communist aliens."[103] These cases, while not exhaustive,

demonstrate that Congress and the Executive Branch can use categorical presumptions as proxies

for the traditional bond factors.[104]

---

[101] *Demore*, 538 U.S. at 513 ("We hold that Congress, justifiably concerned that deportable criminal aliens who are not detained continue to engage in crime and fail to appear for their removal hearings in large numbers, may require that persons such as respondent be detained for the brief period necessary for their removal proceedings." (citing 8 U.S.C. § 1226(c))).

*See also* 8 U.S.C. § 1226(c)(1) (requiring that "[t]he Attorney General shall take into custody any alien who" is inadmissible or deportable for having been charged, arrested, or convicted of a particular offense, or for having admitted to committing a particular offense)

[102] *Flores*, 507 U.S. at 298, 313 (holding that the Immigration and Nationality Service ("INS") could detain "arrested alien juveniles" without the opportunity for bail when the agency could not release the child to a parent, close relative, or guardian (citing 8 C.F.R. § 242.24(b)(1))).

[103] *Carlson v. Landon*, 342 U.S. 524, 541 (1952) (holding that "evidence of membership plus personal activity in supporting and extending the [Communist] Party's philosophy concerning violence gives adequate ground for detention. It cannot be expected that the Government should be required in addition to show specific acts of sabotage or incitement to subversive action.").

[104] The Supreme Court has emphasized that Congress can make "reasonable presumptions and generic rules" under its "traditional power to legislate with respect to aliens." *Demore*, 538 U.S. at 526 (quoting *Flores*, 507 U.S. at 313). Likewise, the Executive Branch is not expected to "forswear use of reasonable presumptions and generic rules" when making detention regulations and determinations. *Flores*, 507 U.S. at 313.

*See Demore*, 538 U.S. at 525 ("Congress had before it evidence suggesting that permitting discretionary release of aliens pending their removal hearings would lead to large numbers of deportable criminal aliens skipping their hearings and remaining at large in the United States unlawfully." (citing 8 U.S.C. § 1226(c))).

*See Flores*, 507 U.S. at 310 ("[C]oncern for the welfare of the juvenile will not permit release to just any adult . . . ."); *see also id.* at 312 ("[R]eliance upon the States to determine guardianship is quite in accord with what Congress has directed in other immigration contexts."); *but see id.* at 313–14 ("In the case of each detained alien juvenile, the INS makes those determinations that are specific to the individual and necessary to accurate application of the regulation: Is there reason to believe the alien deportable? Is the alien under 18 years of age? Does the alien have an available adult relative or legal guardian? Is the alien's case so exceptional as to require consideration of release to someone else? The particularization and individuation need go no further than this.").

### 1.    Procedural Due Process Challenge

There are two distinct protections nested under the umbrella of the Due Process Clause, and each provides an independent basis to challenge detention as unconstitutional.[105] *Substantive* due process "prevents the government from engaging in conduct that 'shocks the conscience' or interferes with rights 'implicit in the concept of ordered liberty.'"[106] *Procedural* due process is "meant to protect against the mistaken or unjustified deprivation of life, liberty, or property."[107] Even if "government action depriving a person of life, liberty, or property survives substantive due process scrutiny, it must still be implemented in a fair manner."[108]

Petitioner challenges his detention on both grounds.[109] As discussed below, Petitioner is entitled to relief on procedural due process grounds, so the Court does not address his substantive due process claim further.[110]

---

*See Carlson*, 342 U.S. at 541 ("[A]ll alien Communists are deportable, like Anarchists, because of Congress' understanding of their attitude toward the use of force and violence in such a constitutional democracy as ours to accomplish their political aims . . . ."); *see also id.* at 538 ("Detention is necessarily a part of this deportation procedure. Otherwise aliens arrested for deportation would have opportunities to hurt the United States during the pendency of deportation proceedings. Of course purpose to injure could not be imputed generally to all aliens subject to deportation, so discretion was placed by the 1950 Act in the Attorney General to detain aliens without bail . . . .").

[105] *See, e.g.*, *Salerno*, 481 U.S. at 746 ("This Court has held that the Due Process Clause protects individuals against two types of government action.").

[106] *Id.* (first quoting *Rochin v. California*, 342 U.S. 165, 172 (1952), then quoting *Palko v. Connecticut*, 302 U.S. 319, 325–26 (1937)).

[107] *A.A.R.P. v. Trump*, 605 U.S. 91, 94 (2025) (quoting *Carey v. Piphus*, 435 U.S. 247, 259 (1978) (citation modified)).

[108] *Id.* (citing *Mathews*, 424 U.S. at 335).

[109] *See* Pet. at 13.

[110] *Cf. Budha v. Murray*, No. 1:25-CV-01941-JLT-HBK (HC), 2026 WL 266429, at *2 n.3 (E.D. Cal. Feb. 2, 2026) (opting to address procedural but not substantive due process claim).

In *Mathews v. Eldridge*, the Supreme Court articulated a three-part balancing test to determine whether a procedural due process violation has occurred.[111] This analysis is "limited to determining whether the procedures meet the essential standard of fairness under the Due Process Clause and does not extend to imposing procedures that merely displace congressional choices of policy."[112] The factors are as follows:

1) "The *private interest* that will be affected by the official action";

2) "The *risk* of an erroneous deprivation of such interest through the procedures used, and the *probable value*, if any, of additional or substitute procedural safeguards"; and

3) "The *Government's interest*, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail."[113]

Although *Mathews* involved a challenge to the deprivation of *property*,[114] the Court later clarified that the three-part test can be applied in challenges to the deprivation of *life* and

---

[111] *Mathews*, 424 U.S. at 334–35.

[112] *Landon v. Plasencia*, 459 U.S. 21, 34–35 (1982).

[113] *Mathews*, 424 U.S. at 335 (emphases added).

[114] *Id.* at 323 (involving challenge to termination of disability benefits).

*liberty*.[115] Thus, district courts have broadly relied on the *Mathews* factors to evaluate procedural due process challenges to pre-removal-order detention.[116]

Nonetheless, "when confronted with constitutional challenges to immigration detention," the Supreme Court "has not resolved them through express application of *Mathews*."[117] Therefore, it is unclear if the Supreme Court's abstention from the *Mathews* factors should

---

[115] *Hamdi*, 542 U.S. at 528–29 (2001) (explaining that the Court uses "the test that [it] articulated in *Mathews*" for "determining the procedures that are necessary to ensure that a citizen is not deprived of life, liberty, or property, without due process of law" (citation modified)).

*See also Mathews*, 424 U.S. at 333 ("The 'right to be heard before being condemned to suffer grievous loss of any kind, even though it may not involve the stigma and hardships of a criminal conviction, is a principle basic to our society.'" (quoting *Joint Anti-Fascist Refugee Comm.*, 341 U.S. at 168 (Frankfurter, J., concurring))); *see also id.* ("The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965))).

[116] *See, e.g.*, *Madestras v. Raycraft*, No. 1:26-CV-00279, 2026 WL 522956, at *6 (W.D. Mich. Feb. 25, 2026); *Delgado Rodriguez v. Tate*, No. 4:26-CV-00650, 2026 WL 517983, at *2 (S.D. Tex. Feb. 25, 2026); *Aroca v. Mason*, No. 2:26-CV-00057, 2026 WL 357872, at *18 (S.D.W. Va. Feb. 9, 2026); *De La Cruz Salmeron v. Olson*, No. 4:25-CV-00198-RGJ, 2026 WL 324486, at *10 (W.D. Ky. Feb. 6, 2026); *Hernandez Licona*, No. 2:26-CV-02081-SHL-ATC, 2026 WL 334020, at *7 (W.D. Tenn. Feb. 6, 2026); *Altin v. Chestnut*, No. 1:26-CV-00792-DC-CSK, 2026 WL 309563, at *6 (E.D. Cal. Feb. 5, 2026); *Perez Bueno v. Janecka*, No. 5:25-CV-03376-CAS-BFM, 2026 WL 309934, at *3 (C.D. Cal. Feb. 5, 2026); *Hernandez Nunez*, No. 26-0476, 2026 WL 321440, at *5 (E.D. Pa. Feb. 5, 2026); *Briceno Solano v. Mason*, No. 2:26-CV-00045, 2026 WL 311624, at *16 (S.D.W. Va. Feb. 4, 2026); *Sawari v. Wamsley*, No. 2:26-CV-00121-TL, 2026 WL 279968, at *2 (W.D. Wash. Feb. 3, 2026); *Ab-Rahim v. Marich*, No. 6:26-CV-06005-EAW, 2026 WL 279113, at *2 (W.D.N.Y. Feb. 3, 2026); *Velasquez v. Noem*, No. 3:25-CV-00998, 2026 WL 279226, at *7 (E.D. Va. Feb. 3, 2026).

District courts within the Western District of Texas have taken the same approach. *See, e.g.*, *Ochoa v. Vergara*, --- F. Supp. 3d ----, 2026 WL 482211, at *2 (W.D. Tex. Feb. 20, 2026); *Acosta Dominguez v. Noem*, No. EP-25-CV-00741-DB, 2026 WL 67200, at *3 (W.D. Tex. Jan. 8, 2026); *Lopez Miranda v. Flores*, No. EP-25-CV-584-KC, 2025 WL 3901908, at *2 (W.D. Tex. Dec. 10, 2025).

[117] *Rodriguez Diaz v. Garland*, 53 F.4th 1189, 1206 (9th Cir. 2022).

counsel against their use in this case.[118] For now, this Court consults the *Mathews* factors as a heuristic for balancing the countervailing interests at the heart of the Due Process Clause, but it does not base its ruling on these factors alone.[119]

### a.    Private Interest

As to the first *Mathews* factor, the Court considers "the private interest that will be affected by the official action."[120] Civil detainees possess a cognizable interest in their physical freedom during the pendency of their removal proceedings[121] and a "substantial liberty interest in not being confined unnecessarily."[122] This interest does not vanish simply because the individual entered the United States without legal admission.[123]

---

[118] In the context of *other statutory provisions*, circuit courts are split over whether the *Mathews* factors apply to challenges to mandatory detention. *Contrast Banyee v. Garland*, 115 F.4th 928, 933 (8th Cir. 2024), *with Black v. Almodovar*, 156 F.4th 171, 182 (2d Cir. 2025) (Menashi, J., dissenting from the denial of reh'g *en banc*) (accusing panel of "entrench[ing] a split with the Eighth Circuit, which has squarely held that *Mathews* balancing does not apply to a challenge to detention under § 1226(c)").

*But see Rodriguez Diaz*, 53 F.4th at 1206-07 ("assum[ing] without deciding that *Mathews* applies" to a challenge to discretionary detention under 8 U.S.C. § 1226(a)).

[119] *See Mathews*, 424 U.S. at 334–35 ("Accordingly, resolution of the issue whether the administrative procedures provided here are constitutionally sufficient requires analysis of the governmental and private interests that are affected. More precisely, our prior decisions indicate that identification of the specific dictates of due process generally requires consideration of three distinct factors . . . .").

[120] *Id.* at 335.

[121] *See, e.g.*, *Vieira v. De Anda-Ybarra*, No. 3:25-CV-00432-DB, 2025 WL 2937880, at *6 (W.D. Tex. 2025) ("A noncitizen's interest in his freedom pending the conclusion of his removal proceedings deserves great weight and gravity." (citation modified)).

[122] *See Parham v. J.R.*, 442 U.S. 584, 600 (1979); *see also Salerno*, 481 U.S. at 750 ("We do not minimize the importance and fundamental nature of this right.").

[123] *See supra* notes 87–89. *See also, e.g.*, *Garcia*, 2025 WL 3645179, at *4 ("Petitioner [who entered the United States without detection] has acquired a liberty interest by being present in the United States for nearly twenty years.").

Petitioner has lived in the United States since 1996, during which time he became a father to four children and the sole breadwinner for his family.[124] His longstanding ties to the country do not indicate that he would flee during the pendency of his removal proceedings, and there is no evidence to suggest that he poses a risk of danger to others.[125] Petitioner is "experiencing all the deprivations of incarceration, including loss of contact with friends and family, loss of income earning, lack of privacy, and, most fundamentally, the lack of freedom of movement."[126] Because Petitioner possesses a cognizable interest in his physical freedom, the first *Mathews* factor weighs in his favor.

### b.    Risk of Erroneous Deprivation

As to the second *Mathews* factor, the Court considers "the risk of an erroneous deprivation of [one's liberty] interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards."[127] "Procedural due process rules are meant to protect persons not from the deprivation, but from the *mistaken* or *unjustified* deprivation of life, liberty, or property."[128] Therefore, those rules should ensure that "the nature of commitment bear some reasonable relation to the purpose for which the individual is committed."[129]

---

[124] Pet. at 3, 12.

[125] Petitioner's limited criminal history involves one conviction for driving without a valid license. *See id.* at 4.

[126] *See Martinez v. Noem*, No. 5:25-CV-01007-JKP, 2025 WL 2598379, at *3 (W.D. Tex. Sept. 8, 2025).

[127] *Mathews*, 424 U.S. at 335.

[128] *Piphus*, 435 U.S. at 259 (emphases added).

[129] *See Foucha*, 504 U.S. at 72 (citing *Jones*, 463 U.S. at 368).

As discussed below, the Government's "legitimate interests justify a relatively short-term deprivation of liberty,"[130] but detention no longer bears a reasonable relation to its purpose when "the noncitizen's detention is prolonged without any particularized assessment of need."[131] Petitioner has now been in Respondents' custody for more than eight months.[132] Respondents have offered no particularized justification to continue detaining Petitioner, other than the assertion that his release would produce "no net gain."[133]

In this case, a custody redetermination hearing would provide Petitioner with the opportunity to be heard and allow the Government to assess whether a "nonpunitive" rationale for detention exists in this case, thus mitigating "the risk of an erroneous deprivation of [Petitioner's liberty] interest."[134] Therefore, the second *Mathews* factor weighs in favor of Petitioner.

---

[130] *Demore*, 538 U.S. at 513.

[131] *See Black v. Decker*, 103 F.4th 133, 154 (2d Cir. 2024); *see also id.* ("Where the noncitizen poses no danger and is not a flight risk, all the government does in requiring detention is separate families and remove from the community breadwinners, caregivers, parents, siblings and employees." (citation modified)).

*Cf. Calderon-Chavez*, 688 F. Supp. 3d at 479 ("Nor does the *duration* of Defendant's lengthy pre-hospitalization confinement bear any reasonable relation to its purpose. The purpose of the 'pre-hospitalization commitment period . . . is simply to identify an appropriate treatment facility and arrange for the defendant's transportation to that facility.' While *some* amount of delay undoubtedly advances that purpose, a nine-month period of inactivity does not." (citation modified)).

[132] *See supra* notes 23–24 and accompanying text.

[133] Resp. at 2.

[134] *Mathews*, 424 U.S. at 335; *see also, e.g., Almodovar*, 156 F.4th at 194 ("In the context of preventive civil detention, the most fundamental due process protection is an individualized hearing, before a neutral decisionmaker, to justify government detention." (citation modified)).

c.       Government's Interest

As to the third *Mathews* factor, the Court considers "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail."[135]

Under *Mathews*, courts "must weigh heavily in the balance that control over matters of immigration is a sovereign prerogative, largely within the control of the executive and the legislature."[136] The Government has an "especially" strong interest "when it comes to determining whether removable aliens must be released on bond during the pendency of removal proceedings."[137] As relevant here, detention serves to "increase[e] the chance that, if ordered removed, the aliens will be successfully removed."[138] Detention to meet those ends can therefore be a "constitutionally valid aspect of the deportation process."[139]

Under 8 U.S.C. § 1225(b)(2), the purpose of detention is to facilitate a hearing where "an immigration judge shall conduct proceedings for deciding the inadmissibility or deportability of an alien."[140] In other words, the mandatory detention scheme—by its own terms—is designed to

---

[135] *Mathews*, 424 U.S. at 335.

[136] *See Rodriguez Diaz*, 53 F.4th at 1208 (quoting *Plasencia*, 459 U.S. at 34).

[137] *Id.* (citing *Demore*, 538 U.S. at 515).

[138] *Id.* (quoting *Demore*, 538 U.S. at 528).

[139] *Demore*, 538 U.S. at 523 (citing *Wong Wing v. United States*, 163 U.S. 228, 235 (1896)).

*See also Salerno*, 481 U.S. at 746 ("As an initial matter, the mere fact that a person is detained does not inexorably lead to the conclusion that the government has imposed punishment." (citing *Wolfish*, 441 U.S. at 537)); *but see Velasco Lopez v. Decker*, 978 F.3d 842, 854 (2d Cir. 2020) (identifying "the Government's interest—one we believe to be paramount—in minimizing the enormous impact of incarceration in cases where it serves no purpose").

[140] 8 U.S.C. § 1229a.

*promote* process. It is unclear how detention without the opportunity for bond has promoted that process here, given that Petitioner has remained in detention without a final removal order for more than half a year.

Further, there is nothing to suggest that detainees subject to § 1225(b)(2) share a categorical characteristic that supersedes their individual interests in physical freedom.[141] The sole thread binding every noncitizen detained under § 1225(b)(2) is that "the examining immigration officer" has determined that the noncitizen "is *not clearly and beyond a doubt* entitled to be admitted."[142] As the Supreme Court and Respondents agree, this statutory provision is a "catchall" for individuals who fall outside the scope of § 1225(b)(1).[143] There is little to suggest that Congress created a new category akin to criminals, children, or Communists.[144]

In this case, the burdens necessary to ensure substitute or additional process are *de minimis*. There may be an "incremental cost resulting from the increased number of hearings" if

---

[141] *See supra* notes 101–103 and accompanying text.

[142] 8 U.S.C. § 1225(b)(2) (emphasis added).

[143] *See also supra* note 38 and accompanying text.

[144] Respondents argue that "[t]his administration's interpretation of mandatory detention of applicants for admission only advances Congressional intent to equalize the playing field between those who follow the law and those who do not." Resp. at 13. By "those who do not [follow the law]," they refer to "aliens who entered without inspection." *Id.*

This argument further underscores the heterogeneity of the individuals who are subject to detention under § 1225(b)(2). *See Buenrostro-Mendez*, 166 F.4th at 499 ("Following the passage of [the Illegal Immigration Reform and Immigrant Responsibility Act of 1996], then, an alien's status as an applicant for admission does not turn on where or how the alien entered the United States.").

bond hearings are once again provided to individuals detained under § 1225(b)(2),[145] but there is certainly a cost associated with Petitioner's continued detention.[146] The Government's interest in using detention to effectuate removal proceedings is strong, but a bond hearing would (1) pose a minimal administrative burden; and (2) serve the stated purpose of 8 U.S.C. § 1225(b)(2). Thus, the third *Mathews* factor weighs in favor of Petitioner.

In sum, all three *Mathews* factors weigh in favor of Petitioner. But the Court's analysis does not end here.[147] As discussed above, the *Mathews* balancing test merely distills the competing interests that the Supreme Court consistently weighs in the Due Process context.[148] On one side of the scale, Petitioner has a cognizable liberty interest of which he has been

---

[145] *See Lopez-Arevelo*, 801 F. Supp. 3d at 687 (citation modified); *see also, e.g.*, *Decker*, 103 F.4th at 154 ("Certainly, having to do something instead of nothing imposes an administrative and fiscal burden of some kind."); *see also, e.g.*, *Singh v. Andrews*, No. 25-cv-801, 2025 WL 1918679, at *8 (E.D. Cal. July 11, 2025) ("In immigration court, custody hearings are routine and impose a 'minimal' cost.").

[146] *See Decker*, 103 F.4th at 154 (noting that "the Department of Justice reported an average cost of detaining noncitizens, in 2019, of $88.19 per prisoner per day").

[147] *See supra* notes 118–119 and accompanying text.

[148] *Mathews*, 424 U.S. at 334–35 (explaining that the Supreme Court's "prior decisions indicate that identification of the specific dictates of due process generally requires consideration of three distinct factors").

*See also, e.g.*, *Swarthout v. Cooke*, 562 U.S. 216, 219 (2011) ("As for the Due Process Clause, standard analysis under that provision proceeds in two steps: We first ask whether there exists a liberty or property interest of which a person has been deprived, and if so we ask whether the procedures followed by the State were constitutionally sufficient.").

*See also, e.g.*, *Zadvydas*, 533 U.S. at 690 (holding that civil detention is only constitutionally permissible in "special and narrow nonpunitive circumstances, where a special justification . . . outweighs the individual's constitutionally protected interest in avoiding physical restraint" (paraphrasing *Foucha*, 504 U.S. at 80)); *see also Addington*, 441 U.S. at 425 ("This Court repeatedly has recognized that civil commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection.").

deprived.[149] On the other, the Government has a clear interest in effectuating removal proceedings.[150] Here, there is not a sufficiently "special justification" that "outweighs the individual's constitutionally protected interest in avoiding physical restraint."[151] To the contrary, Petitioner has languished in Respondents' custody for more than eight months "without any particularized assessment of need."[152]

For the foregoing reasons, the Court finds that Respondents, by detaining Petitioner without the opportunity for a custody redetermination hearing, have deprived Petitioner of his procedural due process rights under the Fifth Amendment of the United States Constitution.

### D.    Relief

Petitioner requests immediate release from custody.[153] Respondents maintain that "such release would not provide him any lawful status in the United States and produce him no net gain."[154] This assertion misstates the function of the writ of habeas corpus, which is not conditioned on the "net gain" available to a detainee upon release from unlawful confinement.[155]

---

[149] *See supra* notes 84–91 and accompanying text (explaining that the Due Process Clause applies to noncitizens like Petitioner, even though its protections apply with greater force to citizens); *see also supra* notes 120–126 and accompanying text (determining that Petitioner has been deprived of his liberty interest under the Due Process Clause).

[150] *See supra* notes 137–139 and accompanying text (explaining, without reference to the *Mathews* factors, that the Government can constitutionally detain noncitizens to facilitate removal proceedings).

[151] *See supra* note 93.

[152] *See supra* note 131.

[153] Pet. at 15.

[154] Resp. at 2.

[155] *See supra* notes 40–43.

The majority of courts appear to require a bond hearing before an IJ for immigration detainees held in violation of due process.[156] To secure their release at a bond hearing, noncitizens typically bear the burden of demonstrating that they are neither a danger nor a flight risk.[157] Where bond hearings are ordered as a habeas remedy, however, the burden shifts to the Government to show, by clear and convincing evidence, that the detainee poses a danger or flight risk.[158]

"[G]iven that the Court has found a *procedural* due process violation,"[159] the Court agrees that a bond hearing is an adequate remedy.[160] However, the Court finds it appropriate to require that the bond hearing be completed within a short window.[161] If Respondents do not

---

[156] *See, e.g.*, *Lopez-Arevelo*, 801 F. Supp. 3d at 688 (collecting cases); *see also, e.g.*, *Garcia*, 2025 WL 3645179, at *5 (collecting cases).

[157] 8 C.F.R. § 236.1(c)(8); *id.* § 1003.19(h)(3).

[158] *Lopez-Arevelo*, 801 F. Supp. 3d at 688 (citing *Velasco Lopez*, 978 F.3d at 855).

*See also id.* ("Allocating the burden in this manner reflects the concern that because the alien's potential loss of liberty is so severe, he should not have to share the risk of error equally." (quoting *German Santos v. Warden Pike Cnty. Corr. Facility*, 965 F.3d 203, 214 (3d Cir. 2020) (citation modified))); *Velasquez Salazar v. Dedos*, No. 1:25-CV-00835-DHU-JMR, 2025 WL 2676729, at *9 (D.N.M. Sept. 17, 2025) (finding "that the burden of proof at Petitioner's bond hearing should rest with the Government").

[159] *See Lopez-Arevelo*, 801 F. Supp. 3d at 687.

[160] *See* Pet. at 11 (stating that Petitioner "has requested multiple custody redetermination hearings" to no avail).

[161] *Cf. Velasquez Salazar*, 2025 WL 2676729, at *9 (requiring the same in light of petitioner's three-month-long detention).

provide the individualized hearing required by this Order, they must release Petitioner under reasonable conditions of supervision.[162]

Petitioner also requests costs and attorney's fees.[163] To recover fees against the Government, Petitioner must demonstrate that the Government waived its sovereign immunity.[164] Under the Equal Access to Justice Act ("EAJA"), attorney's fees "are not available in habeas corpus proceedings like this one."[165] The Court therefore denies this request.

## IV.    Conclusion

For the foregoing reasons, the Court determines that (1) it has jurisdiction over the above-captioned matter; and (2) Petitioner has established a violation of the Due Process Clause of the Fifth Amendment as applied to him.

**IT IS HEREBY ORDERED** that Petitioner Victor Zamudio Sanchez's "Petition for Writ of Habeas Corpus" (ECF No. 1) is **GRANTED IN PART**.

**IT IS FURTHER ORDERED** that Respondents **SHALL** (1) provide Petitioner with a bond hearing before an Immigration Judge, at which the Government shall bear the burden of justifying, by clear and convincing evidence, the dangerousness or flight risk justifying

---

[162] *See* 8 U.S.C. § 1231(a)(3) (requiring that the alien "appear before an immigration officer periodically for identification," "give information under oath about the alien's nationality, circumstances, habits, associations, and activities, and other information the Attorney General considers appropriate," and "obey reasonable written restrictions on the alien's conduct or activities that the Attorney General prescribes for the alien.").

[163] Pet. at 15.

[164] *See Barco v. Witte*, 65 F.4th 782, 784 (5th Cir. 2023) ("Any waiver of the United States' sovereign immunity must be express, unequivocal, and any ambiguity therein strictly construed in favor of the sovereign.").

[165] See *Pineda v. Noem*, No. SA-25-CA-01518-XR, 2025 WL 3471418, at *6 (W.D. Tex. Dec. 2, 2025) (citing *Barco*, 65 F.4th at 785).

Petitioner's continued detention; **OR** (2) release Petitioner from custody under reasonable conditions of supervision **no later than March 9, 2026**.

      **IT IS FURTHER ORDERED** that Respondents **SHALL NOTIFY** Petitioner and his counsel **at least 24 hours** prior to his hearing or release (including the date, time, and location).

      **IT IS FURTHER ORDERED** that Respondents **SHALL FILE** an advisory with the Court **no later than March 12, 2026**, containing (1) detailed reasons for the bond hearing decision; **OR** (2) confirmation of Petitioner's release.

      **IT IS FURTHER ORDERED** that in the event Petitioner is released, Respondents **SHALL RETURN** Petitioner's property to him (including identification, immigration papers, cell phone, money, keys, and any other personal effects).

      **IT IS FINALLY ORDERED** that Respondents **SHALL FILE** an advisory with the Court **no later than March 5, 2026**, if the Government issued a final order of removal against Petitioner prior to the undersigned date. As stated above, the Court has based its analysis on the assumption that one does not exist. If that assumption is incorrect, a different analytical framework may apply.[166]

      **So ORDERED and SIGNED this 2nd day of March 2026.**

**DAVID C. GUADERRAMA**
**SENIOR U.S. DISTRICT JUDGE**

---

[166] *See Zadvydas*, 533 U.S. at 701.